on Mr. Finlayson. Mr. Finlayson. Thank you, sir. May it please the court, counsel. I represent Mr. Shabazz. I'd like to talk about three issues this morning. Two are related. It's the introduction of uncharged conduct, the 2,000 not charged fraudulent tax returns in the guilt-innocence phase, as well as their use at sentencing to enhance the sentence. I'd also like to talk this morning about the role issue where my client got a four-level role enhancement when there was insufficient evidence to support that enhancement. And the trial court switched the burden up when he made a finding of, well, I can't find you didn't prove it, therefore I find you proved it. So those are the issues I'd like to discuss this morning. As you know, my client was charged with 15 substantive tax fraud counts, 15 corresponding aggravated identity theft counts. The government introduced 2,000 uncharged acts against my client to try to support their case, to try to prove these events, the 15, and their justification was that, hey, these were also charged under count one, the conspiracy. The fact is they were not sufficiently charged under count one, the conspiracy. They were listed in the manner and means section of the indictment. However, they weren't listed by victim, they weren't listed by date, they weren't listed by social security number. There was insufficient indicia to say, hey, these were actually charged in the indictment. They were referenced in passing along with 13,000 other applications. So we cannot say this was charged conduct. This clearly was uncharged conduct. The government has relied upon, the district court relied upon the Ford case. And I think the Ford case is really where we will end up in this case. And the Ford case, the reason why they want to go to Ford is because if you go to 404B, one of the first steps in 404B is you have to show the defendant was the committer, was actively involved in the commission of the uncharged conduct. So they want to skip that and go into Ford and say, hey, this is intrinsic, this is intrinsic to the events, this is part of the same scheme. But they don't have that evidence. As to the 2,000 uncharged events, you don't have my client preparing a single tax return, and that's what's unusual about this case. Factually, you have no cooperators, you have no internal vision into how this scheme operated. My client didn't prepare the tax returns, his fingerprints weren't on any documents, he wasn't there at the bank picking up the money or withdrawing the funds. It's all unknown how this scheme operated. All you have is my client's name on the charity. He's the figurehead of that charity as the founder and leader of the charity. But he's, there's no inside information. So when we have, that is in terms of the 15 charged events, and then we go to the 2,000 uncharged, we have the same problem. There's no proof he did them. Now, in the Ford case, she, Mrs. Ford, was a tax preparer herself. She, her name and company name were on the uncharged returns. She was at the bank taking the money out of the bank. We don't have that with Mr. Shabazz. More troubling with Ford, we have with Mr. Shabazz, though, is that the uncharged tax returns were all filed in the names and with the Social Security numbers of prisoners who had applied to Indigent Inmate, right? Yes, sir. But that, and if I may respond. They all claimed refunds for the same time period, years 2009 through 2012. They all listed one of 15 common addresses. They all had similar features such as Schedule C forms that claim large car and tax expenses and false W-2s that listed Revco or CVS as an employer. These, these are really all alike, aren't they? No, sir. With all due respect, no, sir. We don't have 15 common addresses. I dispute that factually. There were four addresses that were definitely connected to my client, Mr. Shabazz. Four out of opening statement, in fact, that said, hey, some of these are vacant houses. We can't tie him to those. The, there's some in the middle where there's like a cousin who may have used a reference and may have said, like, I could say, I could personally fill out a loan application, list Judge Karnes as a reference. Doesn't mean she joined my conspiracy, just means I knew to throw her name out there. So, I dispute a lot of that. But they weren't four, I mean, the 15 addresses all also had the common thread that false tax returns were coming from those addresses or the refunds were being sent to those addresses, right? But again, you don't have Mr. Shabazz on the front end or the back end. Four of those addresses, I'll give you, he was tied to, but that's not enough to bring in 2,000. What about the connection to indigent inmates? And admittedly, there are 13,000 forms in that office, but there are also 13,000, in fact, hundreds of thousands of inmates in our prisons all over. This was a rampant scheme, as you know. This scheme was going on across the country. The inmates themselves had access to their data. They, you know, these are not likely, these are not the only forms they sent out. There were two witnesses that testified who they didn't have an indigent inmate form for. Also, we had two other people in that office. We had Leslie Shabazz and Sheena Shabazz, who were, by all witness accounts, the active people that were running that charity day-to-day. Those were his wives? Yes, ma'am. They were his wives. And there were... The laws here, I guess. We would have maybe worked out that deal, but there were four of them. Yes, ma'am. But they were his wives. But again, there's no evidence of how this operation happened. The government called several employees of the company. None of them were charged. None of them were criminally liable. And they all testified. I was there every day. I never saw anybody doing fraud. I never saw Mr. Shabazz was out a lot of the time. Leslie Shabazz, Sheena Shabazz, they were the people running this charity day-to-day. They are the people that had access to this data. And likely, they are the people who perpetrated this fraud. But it's an unusual case in that we don't have any of those details of their inner workings. As far as the other commonalities or alleged commonalities, a lot of these are ubiquitous in tax fraud. I mean, these ideas, oh, they inflated mileage, or they inflated expenses, or they gave false employees to commit tax fraud. These are what people do. I mean, to say, oh, he worked at Coca-Cola in Atlanta is not exactly like... It's not a smoking gun. It's not a fingerprint. And again, you know, in Ford, we had nine external, nine returns coming in. Well, I know you're not arguing it today, but in your brief, you're trying to get the wallet suppressed. Right. Because in the wallet was evidence that connects your client to the crime, right? Absolutely right. And that's one, Your Honor. One out of 2,000. That's the only one. And it's the William Malone card. And there was also a check on the account of William Malone. That's one out of 2,000 pieces of uncharged evidence. Now, they should have just indicted the Mr. Malone offense. If they had that evidence, that's solid. That's the one, but it's not the other 1,099. And so, and the fact of it is, whether you do this as 404B, or whether you do this under the Ford, you know, the underlying Ford analysis is race just tie. I mean, that's when you look at the Baker case that's cited in Ford. It's all race just tie. This was very compartmentalized. You had addresses in Pittsburgh. You had addresses in Chattanooga. You had addresses in Atlanta. It was not required to be part of this story to bring in these other venues or these other offenses. They should have been carved out. The government would have plenty of evidence to proceed with their case. They didn't need to bring in all this uncharged. It's too many. Very quickly, if I can move to roll. There was no evidence of who my client supervised. He ran four different businesses. He had a car detailing. He had the charity. He had the chicken and the eggs. He had all these venues or all these endeavors going on. There's no evidence he supervised anybody in the commission of fraud. And with all due respect to the trial court, he got it wrong. And he said, well, he makes this comment, you know, the defense lawyer argues that sentencing, you know, there's no evidence my client supervised these people. And Judge Batten says, well, I can't find that he didn't. And that's burden shifting. That's flipping the burdens. Concede if there was evidence sufficient to convict him that he at least supervised two of his wives. No, ma'am, I don't concede that. I don't concede. There's no evidence that he supervised his wife in the commission of any fraud. And I hate to say it, but there's a there is a presumption here that the man's in charge. And every now and then we have those cases. You and I had I looked up. Arthur Bailey came to mind was his former employees testified he was in charge. They they test two employees testified that he was in charge of the legal businesses that were going on and never in charge of any fraud. One of the women, one woman was not exactly happy with Mr. Shabazz because Mr. Shabazz married her daughter. The other guy worked there for two months, and that was his observation with Mr. Shabazz was in charge. But nobody, not one person said he was in charge of the fraud. And it's a four level swing with four points for role and two points for the the monetary increase on the on the loss. There's a six level swing. And we're talking about almost a nine year difference in the sentence that those errors made. So for those reasons and the reasons in my brief, I'm asking the court to vacate.  May it please the court. My name is Mary Webb representing the United States. There was no reversible error in the admission of the 2,000 tax returns, and there was no reversible sentencing error in the application of the role enhancement. In this case, there simply was no burden shifting by the district court. In this case, my opposing counsel talks about the first thing the district court said in response to the defense lawyer's argument. But then there's a next sentence, which is the district court saying, I think that he did. So it's a sort of a natural conversational flow. The defense lawyer says, I don't think that's true. I think he did. I think he does satisfy the enhancement definition or description. That's correct, Your Honor. And so it's read in full context. The district court did not inappropriately shift the burden. And here, there was evidence that Mr. Chabaz directly supervised sentencing. So for instance, in the record. It's two of his wives, his sister, his cousin, and his client. Correct. Including his client, LaShawn Boyd Gordon. And then additionally, the individual Dionne McBride, who was the Pittsburgh located individual who really started the entire investigation. Mr. Finlayson said those people may exist and they may have done bad things, but there's no evidence his client supervised those people. What is your rejoinder to that? Well, for instance, Your Honor, at trial, there was evidence in regards to LaShawn Boyd Gordon, who was the individual living at 1447 Walker Avenue, that he was installed at 1447 Walker Avenue at Mr. Chabaz's direction. So the landlord for that address testified, said Mr. Chabaz rented it. And Mr. Chabaz rented it to put LaShawn Boyd Gordon there, to live there. And then actually, when Mr. Chabaz testified at trial, he talked about needing to pick Mr. Boyd Gordon up and give him rides. There's evidence. That's one person. How about the others? What's the evidence of supervision of the others? In terms of his wives, multiple people testified at trial that in their observation of the relationship between Mr. Chabaz and Leslie Chabaz and then Mr. Chabaz and Sheena Chabaz, that Mr. Chabaz was in charge. And we know that there was evidence that Leslie Chabaz was a criminally culpable individual because at the search warrant execution at Cheney Street, there were documents containing the prisoner personal identifying information in her purse. So we do have evidence that Mr. Chabaz was in charge. And then there's also Dion McBride, who was the individual in Pittsburgh, who told the agents that Mr. Chabaz was in charge. And then there was Mr. Chabaz's statement in response to that, which actually came in at trial, which was that Dion McBride was making Mr. Chabaz out to be in charge of everything, but there were other individuals involved in the Pittsburgh area. So there was sufficient evidence here. That's four people. Yes, Your Honor. And the dispute here between the parties was not over whether there were five criminally culpable people involved or whether it was otherwise extensive. It was whether there was sufficient evidence to find that Mr. Chabaz had actually exercised control over an individual. And so . . . Didn't the government in some statement to the court admit or express concern whether they had gotten to the five or not? I'm not sure which statement the court is asking about, about expressing concern about whether the government had gotten to five individuals. But the argument at sentencing was not over whether the otherwise extensive or five criminally culpable individuals applied. The argument at sentencing was over whether Mr. Chabaz had exercised control sufficient to meet the enhancement for any of these individuals. And so as the government was listing different individuals who Mr. . . . criminally culpable because it had to be a criminally culpable individual. So the government was listing different individuals who Mr. Chabaz had exercised control over who were also criminally culpable. And that's when the back and forth happens between the defense lawyer at sentencing and about whether the government had shown that he did in fact exercise control over any of them. I mean, your argument is essentially to find him guilty. You necessarily are finding he exercised control over this operation based on your evidence. Yes, Your Honor. The government's theory was that Mr. Chabaz was the leader and the head of this fraud scheme that he founded Indigent Inmate, that he was the person truly in charge of it. He's the one out renting these addresses, installing people to live at them. He's the one directing the operations of most of the co-conspirators. And then that he's truly the person in charge of all of this. And so it was the government's position and is the government's position that Mr. Chabaz is the person in charge here. And so there was no impermissible burden shifting by the court here. And there was sufficient record evidence for the court to find that the four-level rule enhancement applied. And that was not an incorrect ruling by the district court. If I may, are there no further questions on that point then? On the issue of admitting the additional tax returns, in this case, the government moved to admit them as inextricably intertwined evidence before the pretrial conference. And at the pretrial conference, that's the theory under which the district court admitted them. And that was based on the Cora Ford case. And it is the case that here, the uncharged, as we're calling them, tax returns, had the similar indicia of fraud and showed that they were really part of the same scheme as the named victim tax returns, named tax returns in the indictment. And here, the government took really a very conservative approach. You have 13,000 indigent inmate applications located at the headquarters. Those are all keyed in by the Pennsylvania analyst and sent to IRS. And then the government's case focused just on 2,000 tax returns that were from the time period of the conspiracy that were in the names of indigent inmate applicants and social And so the government engaged really in a very conservative approach in determining which tax returns to put in as proof and to allege were a part of the scheme and to prove and then also at sentencing to hold Mr. Shabazz accountable for a loss amount. And so under the Cora Ford case, this was appropriate for the district court to admit these at trial and it was also appropriate for the district court to find that the loss amount could be based on these 2,000 tax returns. It was a little bit of an unusual case that there's no actual direct evidence that Mr. Shabazz filed any of these returns. There's no co-conspirator testimony. There's not really anything to, you really are having, I mean, it's a circumstantial case, but you have to make some inferences and some leaps to get there, don't you? To some extent, Your Honor, except for that there's not just one debit card in a wallet for Mr. Shabazz. There is the direct evidence that there's both a William Malone debit card in Mr. Shabazz's wallet at the Cheney Street address. That's the residence where the Pennsylvania agents first showed up. And then there's also the, I believe it was in the name of Sandra Oyewusi debit card in the other wallet that was at his business address. So there's two wallets. One is in the pants pocket and that has the William Malone debit card in it. And keep in mind, Your Honor, that it's not just that the debit card is there. There was also the bank record evidence at trial of how the William Malone tax check was mailed out. It's deposited into an account and then an amount and almost the full amount of those proceeds is written from the William Malone, Inc. business account to Qadir Shabazz and put into Qadir Shabazz's checking account. All those bank records came in at trial. And then also the William Malone, Inc. business checking account debit card. Were any of these other, were any of the wives or any of the others prosecuted? I believe that one of the wives was prosecuted by the state, by Pennsylvania. None of the wives were prosecuted in the Northern District of Georgia, Your Honor. And so then at the business address, there's a wallet on the desk, on Mr. Shabazz's business desk, there's a second wallet. And in that wallet, there's the Sandra Oyewusi debit card, which is just sort of similar to the William Malone debit card. So there's those two debit cards that are really direct evidence as to Mr. Shabazz. And there's also, of course, Mr. Shabazz's post-arrest statement to the agents, which certainly the government argues is inculpatory and showed that he had knowledge of the scheme. And really in that statement, he's just trying to minimize his role. He's not denying that the scheme exists. Yeah, I ran an indigent inmate, but there were a lot of people involved in this, right? Yes. That's what he's saying, right? Yes, that he says, you know, Dion McBride's making me out to be in charge, but there are other people involved in the Pittsburgh area. That's an inculpatory statement. So that's the defendant's own statement. That's evidence found in his own pants and then in his second wallet at the business. And then there's additionally the circumstantial evidence, which I believe the Court's probably familiar with from the party's briefs and the record. And then finally, there is, of course, the fact that Mr. Shabazz chose to testify. And he testified. He denied involvement in the scheme. He offered an explanation for those debit cards by claiming the agents had planted them on him. And so under this Court's precedence, this Court can say that given that the jury clearly disbelieved that since they convicted him, then that also serves as substantive evidence of the defendant's guilt. So if there are no further questions, Your Honors, then this Court should affirm that conviction in the sentence. Thank you. Thank you. Mr. Finlayson, you have five minutes. Thank you, sir. It is true Mr. Shabazz testified. And it is true, obviously, that the jury chose not to believe him. But we cannot say here today. Which we can take as substantive evidence of guilt. I'm sorry, sir? Which we can take as substantive evidence of guilt. You can. But we cannot say that the reason why the jury didn't believe him was the 2,000 extra tax returns. Trying to defend against that volume of evidence, it's impossible. We're talking needles and haystacks. We're talking, this case should have been tried with 15, maybe some additional. Ford was nine additional returns. But 2,000 extra returns to defend against, it's just too much. It's either under Ford or under 404B, the trial court's got to do a 403 analysis. And when you start weighing out the probative value, and you're right, Judge Corrigan, it's all circumstantial. You're piling circumstance on top of circumstance. When you start doing the 403 analysis, it's unfairly prejudicial in terms of its relevance. We've talked about the commonalities. The commonalities are stretched here. It's sort of like saying every drug dealer puts their cocaine in a baggie. I mean, there are some. There are four evidence. There are four addresses that are consistent. But a lot of these things are inherent in the commission of tax fraud. The client's statement, that's an issue, and it is a separate issue we've raised. It's unusual in that there was no recording of that statement. There was no, the testifying officer wrote no report. He read his partner's report, which was based off of notes which were lost. When you read that officer's recounting of the statement, it's pretty darn vague. There's a lot of, I don't recall. What else did he say about Deon McBride? I don't recall. He's denied, he said, I'm not the kingpin. He denied being the kingpin. Did he deny knowing Deon McBride? No. But the statement is not, it is not the smoking gun. Oh, absolutely, I'm guilty of all this tax fraud. So I don't think that is, I understand the point, and I think it's something the court will consider, but I don't think it's the end of the day by any means for Mr. Shabazz there. Going back to the role issue, there's no evidence he supervised these people. Renting an apartment for your cousin or renting an apartment for your rap artist is not supervising someone during the commission of fraud. When we look at what the, what the guidelines. It could be if you're renting it for the purpose of having false tax returns sent to it, right? It is. That's a very big if, though. That's the million dollar if. And there's no evidence that he did. And that's, there's just no evidence that he did. And every witness, when asked about why you were there, there was a story. The guy that ran the car dealership, the car business with Mr. Shabazz, he was like, I was always late to work. My wife and I lived all the way across town. My wife went, they went and set up a daycare center on this side of town. And so this, this place, I could live here. It was much closer to go to work. There were legitimate explanations for, for almost all of these things. And not one of these victims came forward or witnesses came forward and said, I did it to commit fraud. When we look at what the guidelines require for the role enhancement, we talk about, you know, indications of role relate to decision-making authority, recruitment of accomplishments, claimed right to larger share of the fruits of the crime, planning and organizing, degree of control and authority. There's just no showing here. It's all assumed. It's assumed that he's the man, he's the husband, he was in control. And we just can't make, we just can't make that assumption here. It's a four-level swing. It's a, it's a very significant enhancement to my client's sentence. And it's assumed. It's, it's circumstance on top of circumstance. And really the, the volume, I mean, it's, it's all the, again, the volume of the uncharged conduct feeds into all of this. And with all due respect, it's incorrect. It's just should not be the, it shouldn't have been the finding below and it shouldn't be the finding of this court. The, again, there's no evidence he supervised the wives. And there was some testimony that he appeared to be, in terms of the relationship, he, he appeared to be the person in control or in charge. But there's no showing that he was in charge of the fraud. It's just, it's too much of an assumption. I'd ask the court to remand, vacate. I'd like a new trial and or a new sentencing. Thank you. Thank you. We have your case.